IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| MANUEL R. FLORES | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 5:16-CV-00130 |
| | § | |
| THE STATE OF TEXAS, GREG | § | |
| ABBOTT, In his Official Capacity as | § | |
| Governor of Texas, | § | |
| *Defendants.* | § | |

**PLAINTIFF MANUEL R. FLORES' RESPONSE TO DEFENDANTS' MOTION
TO DISMISS AND MOTION FOR JUDGMENT ON THE PLEADINGS**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Manuel R. Flores ("Flores") asks the Court to deny Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) and Motion for Judgment on the Pleadings Pursuant to Rule 12(c) (D.E. No. 8) ("Motion") because:

(1)     Plaintiff, a resident of the targeted area and of Mexican ancestry, has standing to assert this equal protection challenge.

(2)     Defendants' actions are unconstitutional and cannot (or must not) warrant judgment on a Rule 12 motion, but instead, this dispute warrants resolution with a full record by summary judgment in favor of Plaintiff.

(3)     The Governor and the State are not immune from the requirements of the United States Constitution in a suit seeking only declaratory and injunctive relief.

(4)     Defendants' other arguments on the right to privacy, equal protection, and immigration-related preemption are wrong.

**Introduction and Background**

Flores, a U.S. citizen who resides in Laredo, Texas has brought this very narrow challenge to one subsection of a statute that on its face and plain language is patently unconstitutional.

Defendants have never articulated a legitimate reason for the specific subsection which is Section 423.002(a)(14) of the Texas Government Code.  The reason half-heartedly articulated in the Motion is frankly, at best, inaccurate and deceptive.

## I. The Drone Statute and the Equal Protection Challenge

### A.       The UAS or "Drone Statute" at issue.

In 2013, the Texas Legislature passed certain laws pertaining to the operation of Unmanned Aircraft Systems ("UAS" or "drones") and the permissible and impermissible capture of images using UAS.  Some have questioned whether states or local governments can in any way regulate UAS in an area that some argue is entirely federally preempted.[1]  However, Texas is hardly alone in passing state laws regulating UAS as according to one compilation, "[a]t least 41 states have considered legislation related to UAS in the 2016 legislative session" and 14 passed 26 pieces of legislation.[2]  This is in addition to 168 bills considered by 45 states in 2015.[3]

Numerous states have approached issues differently.  For example, California enacted a very narrow statute to prevent the so-called paparazzi from invading the privacy of celebrities and others.[4]  Virginia enacted a statute providing for equal treatment throughout the borders of the Commonwealth, forbidding local governments from treating people differently.[5]  Plaintiff's argument here is consistent with the Constitutional  commitment to equal protection as reflected in Virginia's statute treating all within the geographic boundaries the same.

---

[1] *See e.g., Huerta v. Haughwout*, No. 3:16-cv-358 (JAM), 2016 WL 3919799 *4 (D. Conn. July 18, 2016); Terry Klein, *Federal Preemption of State & Local UAV Enactments*, 12 No. 1 ABA SciTech Law. 16, 17 (Spring 2015).

[2] *see also* Amanda Essex, *Taking Off: State Unmanned Aircraft Systems Policies*, N.C.S.L pp. 13-16, at http://www.ncsl.org/research/transportation/current-unmanned-aircraft-state-law-landscape.aspx.

[3] *Id.*

[4] Cal. Civ. Code § 1708.8; Essex, *Taking Off*, N.C.S.L pp. 13-16, *see supra* n. 3.

[5] VA Code Ann. § 15.2-926.3;

The heart of the Texas statute creates permissible uses and impermissible uses as well as criminal and civil sanctions for violations of the statute.[6]  Specifically, the Texas framework created statutorily-defined permissible uses: capturing images over one's own property or with consent of the owner, providing broad authorities to State and Federal law enforcement officials to perform their necessary police and other functions for the benefit of the public, and certain academic pursuits among others. TEX. GOV'T CODE § 423.002(a).  The Texas framework also created prohibited uses of UAS and prohibitions against the capture of images obtained through operating UAS.  TEX. GOV'T CODE § 423.002(a).  None of these are challenged by this very straightforward lawsuit.

**B.      The Constitutional Equal Protection Issue in this Case.**

What this lawsuit ***does*** challenge is the sore thumb in the statute that is an obvious impermissible disparate treatment of Texans and others that live in certain targeted parts of the State set out in Section 423.002(a)(14), which in its entirety allows the unfettered acquisition of drone-captured imagery "of real property or a person on real property that is within 25 miles of the United States border."  TEX. GOV'T CODE § 423.002(a)(14) (attached as Exhibit 1).

In the context of this otherwise thoughtful framework balancing various policy considerations and interests, this blight is nothing more than a patently discriminatory provision targeting border residents, who are overwhelmingly people of Mexican national origin.  This portion of the statute (a)(14), treats people in this group categorically different from other Texans with no rational--and much less a compelling--state interest.

Defendants disingenuously suggest to the Court that there is some "law enforcement"-related purpose for treating the border residents differently.  See Mot. p. 20.  This is patently

---

[6] TEX. GOV'T CODE §§ 423.002(a), 423.006.

incorrect and misleading.  Even a basic reading of the statute shows that if this Court (as Plaintiff believes it should) strikes down subsection (a)(14) of the statute, there would be absolutely not harm to any legitimate law enforcement purpose served by the statute because the following would remain lawful to capture an image using an unmanned aircraft in Texas:

- Section 423.002(a)(2): in airspace designated as a test site or range authorized by the Federal Aviation Administration for the purpose of integrating unmanned aircraft systems into the national airspace;

- Section 423.002(a)(3): as part of an operation, exercise, or mission of any branch of the United States military;

- Section 423.002(a)(7): pursuant to a valid search or arrest warrant;

- Section 423.002(a)(8): if the image is captured by a law enforcement authority or a person who is under contract with or otherwise acting under the direction or on behalf of a law enforcement authority:
  (A) in immediate pursuit of a person law enforcement officers have reasonable suspicion or probable cause to suspect has committed an offense, not including misdemeanors or offenses punishable by a fine only;
  (B) for the purpose of documenting a crime scene where an offense, not including misdemeanors or offenses punishable by a fine only, has been committed;
  (C) for the purpose of investigating the scene of:
  (i) a human fatality;
  (ii) a motor vehicle accident causing death or serious bodily injury to a person; or
  (iii) any motor vehicle accident on a state highway or federal interstate or highway;
  (D) in connection with the search for a missing person;
  (E) for the purpose of conducting a high-risk tactical operation that poses a threat to human life; or
  (F) of private property that is generally open to the public where the property owner consents to law enforcement public safety responsibilities;

- Section 423.002(a)(9): if the image is captured by state or local law enforcement authorities, or a person who is under contract with or otherwise acting under the direction or on behalf of state authorities, for the purpose of:
  (A) surveying the scene of a catastrophe or other damage to determine whether a state of emergency should be declared;
  (B) preserving public safety, protecting property, or surveying damage or contamination during a lawfully declared state of emergency; or
  (C) conducting routine air quality sampling and monitoring, as provided by state or local law… (*See* Exhibit 1).

The United States Military and FAA operations are clearly covered and protected by Sections 423.002(a)(3) and (2) of the Texas statute respectively, so absolutely no reason exists to justify Section 423.002(a)(14) on those grounds.

Likewise, Sections 423.002(a)(7),(8), and (9) give governmental entities the right to take pictures or capture other footage of Texans ***everywhere in the State on an equal and uniform basis*** (including the border region) and thus absolutely no reason exists to attempt to justify Section 423.002(a)(14) on those grounds.

The artificially created 25-mile "Invisible Fence/Wall" may intend to create a zone resembling something like this:



Due to the well-known national origin composition of the inhabitants of the artificially created 25-mile "Invisible Fence/Wall", Plaintiff contends that the constitutional challenge to

Section 423.002(a)(14) in this case should be viewed through the prism of "strict scrutiny." Strict scrutiny applies not only because the fundamental right of privacy is implicated but also because the challenged law either intentionally or as a matter of disparate impact targets a "suspect" category, specifically persons of Mexican ancestry. *Richards v. LULAC*, 868 S.W.2d 306, 312 n. 6 (Tex. 1993), citing *Hernandez v. Texas*, 347 U.S. 475, 478-79 (1954) and *Castaneda v. Partida*, 430 U.S. 482, 495 (1977).

Plaintiff himself is within the protected class: he resides in Laredo and is of Mexican national origin/ancestry.[7] Plaintiff asks the Court to take judicial notice of the fact that official census show that approximately 90% of the border residents are of Mexican or Latino national origin.[8] Therefore, being "from the border area" has been used as a proxy for "being Mexican" and thus for masking national origin discrimination.

Even if the Court disagreed with Plaintiff that strict scrutiny is warranted and only considers the constitutionally of the portion of the statute at issue under a "rational review", Section 423.002(a)(14) still fails because no rational basis supports a statute that obviously treats border residents, who are disproportionately of Mexican dissent, differently. The plain language of the statute would literally also permit public and private entities and people to use UAS/drones inside of someone's house, office, restaurant, or other dwelling since technology is advancing so rapidly that small UAS/drones can fly indoors and capture images "of real property or a person on real

---

[7] See, Exhibit 4, Declaration of M. Flores. Plaintiff is a U.S. citizen, but that is not material to the analysis since even non-residents without settled immigration status have the right to equal protection and due process under the Fourteenth Amendment. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) (intermediate scrutiny applied to children of undocumented parents).

[8] According to a publication by the State of Texas: The Texas border currently has a population of 2.7 million residents, considered to be one of the busiest international boundaries in the world, and negatively defined by health disparities and social determinants of health. The study notes that most border residents are Hispanic (87.8%). See http://www.dshs.texas.gov/borderhealth/; attached as Exhibit 3; *See also infra* section II.D, pp. 17-18.

property" indoors[9] within this arbitrary zone without a warrant or even invitation.  The 25-mile "invisible fence/wall" is completely arbitrary and has no rational basis.

### C.     The Heart of the Darkness of Border Vigilantism

The plain language of Section 423.002(a)(14) expressly allows for non-governmental, ***private parties*** (whether individuals or corporations) to capture imagery "of real property or a person on real property that is within 25 miles of the United States border."

It may have been a constitutionally permissible option for Texas to have chosen to allow a free reign of capturing UAS imagery "of real property or a person on real property" throughout all 254 counties of Texas ***on an equal footing*** except as otherwise provided by law throughout the State.  It may have been a constitutionally permissible option for Texas to have forbidden the free reign of capturing UAS imagery "of real property or a person on real property" throughout all 254 counties of Texas ***on an equal footing*** except as otherwise provided by law throughout the State. What the Equal Protection Clause forbids (and what the complaint is here) is Texas' ***de jure*** discrimination against certain people without a rational--much less a compelling--state interests.

---

[9] *See e.g.,* Steven Millward, *Chinese drone startup comes out of hiding unveils Hover Camera designed for use indoors,* Techinasia, *(Apr. 26, 2016) at* https://www.techinasia.com/carbon-fiber-hover-camera-indoor-drone-launch; *see also* Signe Brewster, *The DJ Inspire 1: finally, a drone that flies well indoors*, Gigaom (Dec. 20, 2014) at https://gigaom.com/2014/12/20/the-dji-inspire-1-finally-a-drone-that-flies-well-indoors/; BBC Int'l Reports, German firm presents new micro-drone, (Mar. 19, 2004) ("Known as the FanCopter , the micro-drone could even fly inside buildings, an employee of the EMT firm told the ddp news agency on Friday [19 March], on the margins of the CeBIT 2004 computer fair in Hanover")  (collectively attached as Exhibit 5).

Private vigilantism along the border is known to occur.[10]   Some have even expressly advocated the use of UAS technology to have "private enforcement" of immigration laws.[11] Putting aside whether UAS technology to have "private enforcement" of any laws-- domestic abuse, employment discrimination, gun control, poaching, income tax evasion--would be permissible or advisable, the State of Texas simply cannot rationalize targeting border residents and people of Mexican national origin through a blanket ban that profiles people.

Indeed, one of the bill sponsors acknowledged this unequal treatment.  On pages 2-3 of their Motion, Defendants cite to portions of the legislative record.  Part of that record--which Plaintiff attaches as Exhibit 1--is indeed tremendously instructive and illuminative:

> Senator Estes: Senator Rodríguez, this was a good catch. We did not catch this. I believe 14, exemption number 14 says that drones can be used within a 25-mile section of the border. Our legislative intent was to have law enforcement be able to use drones. Private individuals were not, but that's what the bill says. And so, ***what I would like to commit to you is that I agree with you that private individuals should have no more recourse to go over peoples' private land with drones 25 miles from the border than any other place in the state***. So, what I would like to do, at this late date it's impossible to change it, but I will commit to you that we will work with, there's, there's rule-making authority with the DPS in this bill–

---

[10] *See generally Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp. 198, 205-07 (S.D. Tex. 1982) (discussing the Texas Emergency Reserve's members participating in a Klan-sponsored border patrol in Laredo, providing security, and a "sea patrol"); Karla Zabludovsky, *Hunting Humans: The Americans Taking Immigration Into Their Own Hands*, Newsweek, July 23, 2014; *see also* https://www.splcenter.org/hatewatch/2014/07/31/kkk-joins-immigration-debate-calls-corpses-border; *Dicente Et. Al. vs. Barnett*, 24 Nat. J.V.R.A. 6:30 (D. Ariz. 2009), 2009 WL 9052839 (Verdict and Settlement Summary) (tort case arising from rancher "self-help" conduct towards immigrants from Mexico).  In October of 2007, SMU's Deadman School of Law hosted a symposium on immigration-related matters entitled "*Immigrants, **Vigilantes,** and Immigration Reform: Civil Rights in the 21st Century*" which organizer and law professor George Martinez indicated would "deal with calls for restricting immigration in response to an alleged threat to American national identity, increased border law enforcement and associated crossing deaths ***and vigilante activity***.  Special immigration laws and legal procedures enacted for the war on terror and mass marches protesting immigration reform in cities across the United States, including Dallas, will also be discussed." *See* http://smu.edu/newsinfo/stories/immigration-law-symposium.asp (emphasis added).  The language and logic of the bill seems to be popular in certain circles.  *See e.g.*, Travis Gettys, "*Oklahoma Republican Wishes Mexican border was more like Afghanistan: 'We were allowed to shoot them'*", Raw Story, May 31, 2016 at http://www.rawstory.com/2016/05/oklahoma-republican-wishes-mexican-border-was-more-like-afghanistan-we-were-allowed-to-shoot-em/.

[11] *See e.g.*, https://www.youtube.com/watch?v=seN6jdCiqXE (Youtube video about private persons using UAS to capture people perceived to be violating immigration laws); see also: http://aattp.org/ann-coulter-looks-forward-to-trumps-live-drone-shows-for-mexicans-crossing-the-border-video/.

Senator Rodríguez:  Yes.

Senator Estes:  –we'll work with that. I'll even go so far as to say if there's a special session after this, we will address, ***that we'll ask the Governor to put this on the call, to address this one fix that we missed, actually***. And so, either special session or with the rule-making authority, or the next session, should the good voters return us, I think that that's something that needs to be addressed. I would address it immediately, right now, but we're just out of time.

Senator Rodríguez:  Senator Estes, I appreciate that, and the reason for that is as, as you and I acknowledge that in the way that subsection or Section 14 is written, it would allow drones in private property, and including taking images of individuals without their consent if you live within 25 miles–

Senator Estes: Yeah.

Senator Rodríguez: –of the, of the border.

Senator Estes:  That definitely was not my intention, so I really appreciate you bringing this up, and you have my word that I will work on that to correct it.

Senator Rodriguez:  ***And the second concern that I have is that, the way it's written could allow individuals, private individuals, the Minutemen, or others to use their drones to conduct surveillance in the border because of their concerns about immigrants. And we've seen a lot of that in the press over the number of years here that the issue has come up***. We know that the federal government and that even the state, that through DPS, uses drones to conduct surveillance for immigration purposes along the border. And that's not what we're talking about here. The concern here is that that Section 14 exemption would allow private individuals to do that. And so, I understand, then, that your intention is that was not what was contemplated in that provision.

Senator Estes: And that's correct, Senator, and I, excuse me, really do thank you for bringing that up. We just missed that.

Exhibit 2, portions of transcript for Legislative Record (emphasis added).

Thus, even the state actors involved in writing and sponsoring the legislation admitted that promoting vigilantism or assisting private citizens to engage in vigilante acts along the border

would not be a constitutionally legitimate, permissible reason to have this provision.[12]  Defendants now concede in their Motion that "members explicitly recognized that the 25-mile border exception was intended to allow for the use of drones by law enforcement, ***not private citizens***."  Mot. pp. 4 (emphasis added), 9 n.10.  However, a very inconvenient fact defeats this argument: that is not what the plain language of the statute says.  Nor have the Defendants ever taken the position that the authority granted by section 423.002(a)(14) applies only to law enforcement prior to filing the Motion in response to this lawsuit.

## II. Additional Legal Response to Improvidently Filed Motion

### A.      The Serial Abuse of Fed. R. Civ. P. 12 Motions like this one.

This Court is well-aware of the knee-jerk reaction and gross over-use of Rule 12 Motions, particularly in the post-*Iqbal* era.  As Plaintiff indicated in the parties' Joint Pretrial Motion (see D.E. No. 7) and at the July 28, 2016 initial Scheduling Conference hearing before the Honorable Magistrate Judge Guillermo R. Garcia, this case should really be decided by summary judgment after the opportunity for some limited, targeted discovery going to the main and specific issue in the case: does the State's proffered reason in support of Section 423.002(a)(14) survive constitutional scrutiny?

At this junction, ***Defendants have failed to state any justification*** for this facially discriminatory subsection of the statute.  By hiding under a "general denial" and then removing, Defendants have not had to articulate justification in their pleadings.  And, despite burdening the Court with the 40-page Motion, Defendants do not (and indeed the prolix of the Motion suggests they cannot) provide any articulated or coherent justification of Section 423.002(a)(14).  To the

---

[12] *See also* 42 U.S.C. § 1985(3) (civil portion of the Ku Klux Klan Act).  Generally, States including Texas discourage vigilantism. See e.g., *Miles v. State*, 241 S.W.3d 28, 35 n. 31 (Tex. Crim. 2007) (describing broad Texas exclusionary rule devised as means to deter vigilante "Law and Order League" and other citizen groups whose members pledged to aid officers enforce anti-whiskey laws).

extent they rely on the fig leaf of needing legitimate "governmental" or "policing" uses for 25 miles from the border (inside the "Invisible Fence/Border"), that is on its face contradicted by the statute itself. *See supra* pp. 8-9 and Section I.B.

Rule 12(c) motions are reviewed under the same standard as Rule 12(b)(6) motions. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). In considering a Rule 12(b)(6) motion to dismiss, the Court "must accept all well-pleaded factual allegations and, ***viewing them in the light most favorable to the plaintiff***, determine whether the plaintiff has stated a "plausible"—as opposed to merely "speculative" or "conceivable"—claim that he is entitled to relief." *Electrostim Med. Serv's v. Health Care Service Corp.*, 614 Fed. App'x 731 (5th Cir. 2015) (emphasis added); *see also Cruz v. Abbott*, No. 5:16–CV–067-DAE, 2016 WL 1463983 *3 (W.D. Tex. Apr. 14, 2016). "A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss." *Cruz*, 2016 WL 1463983 at *4. A Rule 12(b)(1) challenges the Court's subject matter jurisdiction.

In this case, the Motion is not well-taken and merely a transparent effort to avoid judicial scrutiny. The Court should deny the Motion and defer consideration of the merits (or lack thereof) of Defendants' arguments as to the statutory provision until the Court has cross-motions for summary judgment on a full record with a reasonable briefing schedule.

**B.     Plaintiff has standing.**

While standing is a prerequisite to suit, Plaintiff has it here. *See e.g., Walker v. City of Mesquite*, 169 F.3d 973, 979-80 (5th Cir. 1999). The standing inquiry requires only that a plaintiff show (1) an injury in fact, (2) causation, and (3) a likelihood that a favorable decision will redress the injury. *Warth v. Sedlin*, 422 U.S. 490, 498 (1975). The purpose is to identify "disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014).

Plaintiff resides within the targeted zone by Section 423.002(a)(14) and his national origin is Mexican. *See* Petition (D.E. No. 1) ¶ 19; Ex. 4, Declaration of Manuel R. Flores, ¶¶ 1-3. Defendants' Motion suggests that there has to be an additional injury under the statute (e.g., that someone captures UAS imagery of Plaintiff or his property or his family), but Defendant is wrong because ***the statute on its face itself causes the injury in fact***.   If the Governor signed a law forbidding people of a particular race or ethnic group from using public bathrooms or directing them to use a "separate but equal" water fountain because of their Mexican ancestry ("Whites Only/Hombres Aquí")[13] or because a person has black skin, the patently unconstitutional nature of the law could absolutely be challenged without demonstrating a "specific injury" to the particular person filing suit. *See e.g.,  Shaw v. Hunt,* 517, U.S. 899, 904, 116 S.Ct. 1894 (1994) (person living in gerrymandered district had standing to make equal protection challenge); *Nat'l Rifle Ass'n v. McGraw,* 719 F.3d 338, 344 (5th Cir. 2013) (NRA had standing to challenge Texas' general criminal provision barring persons from carrying handguns in public); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 645 (W.D. Tex. 2014) (same-sex couple had standing to sue Governor to raise challenge based on equal protection); *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 6, 9-10 (Tex. 2011) ("Because the voter only seeks declaratory and injunctive relief, and because each voter seeks the same relief, only one plaintiff with standing is required" and rejecting the argument that they lacked standing because their votes were actually miscounted--a "specific injury" argument).[14]   In this case, as in the *NRA* case as well as other cases, because the denial of the fundamental right at issue to a segment of the State's population (in that case 18-20 year olds, here

---

[13] *See Hernandez v. Texas*, 347 U.S. at 479-80.

[14] *See also Buono v. Norton*, 371 F.3d 543, 547 (9th Cir. 2004) (Roman Catholic being offended by placement of cross sufficed to create standing to challenge under the Establishment Clause); *Smith v. City of Cleveland*, 760 F.2d 720, 721 (6th Cir. 1985) (reversing district court dismissal on grounds that the black plaintiff had not been individual "steered" from the City and therefore lacked sufficient additional specific injury).

border residents), is absolute (complete ban there, complete "fair game" to record images and data here) Plaintiff meets the standing standards just as the 18-20 year olds did in that case. *McGraw*, 719 F.3d at 345.  In other words, even if a person didn't suffer prosecution for trying to drink from the "wrong" water fountain or "carrying the guns", federal courts still allow people to maintain the *de jure* challenge and "standing" does not provide the State an escape hatch from judicial scrutiny of an obviously unconstitutional statute.  *Accord Andrade*, 345 S.W.3d at 8-10.  Plaintiff, as a resident of the region who has already been stigmatized by the arbitrary and unreasonable division created by the invisible fence/wall created by the statute has already also sustained a concrete injury of stigma ***caused by*** the arbitrary distinction. *See DeLeon*, 975 F. Supp. 2d at 645-46.

As to the third part of the test for standing, there is no question that if the Court were to grant the relief sought by the Plaintiff, it will eliminate the injury complained of, and thus an injunction and a declaration would redress the discrete injury at issue.

Due to the nature of other related injuries (captured data or imagery from a potentially difficult to locate UAS), Plaintiff and others may not be aware of violations of other portions of the statute that may already have occurred.  While other Texans who reside outside the artificial 25-mile invisible fence/wall that become aware of an unauthorized capturing of data or imagery may seek redress under Section 423.006, Plaintiff and others like him are forbidden by the challenged provision. Plaintiff and others like him ***are already barred*** from the relief otherwise accorded to other Texans because of the plain language of Section 423.002(a)(14).

C.       **Defendants are not immune from the claims in this case.**

Defendants' Motion with regards to immunity is bizarre and without proper support in the law.  First of all, even under Texas common law, sovereign immunity has no application when a suit challenges whether a statute violates the Constitution. *See e.g., Patel v. Texas Dept. of*

*Licensing & Regulation*, 469 S.W.3d 69, 75-76 (Tex. 2015) (immunity is inapplicable when a suit challenges the constitutionality of a statute and seeks only equitable relief).

Second, by definition, the State of Texas is not immune from challenges that its actions, including its laws, violate the Equal Protection Clause of the United States Constitution in the passing of a statute. *See* U.S. Const. AMEND. XIV; *see also Patel*, 469 S.W.3d at 75-77 ("The State acknowledges this Court's decisions to the effect that sovereign immunity is inapplicable when a suit challenges the constitutionality of a statute and seeks only equitable relief.").

Similarly, Governor Abbott--not personally, but in his official capacity as long as he may hold that office in trust—is not immune from the restrictions in the United States Constitution. Defendant Abbott is the chief executive officer and the chief law enforcement officer of the State of Texas.  Defendant Abbott is responsible for ensuring that the laws of Texas are faithfully executed.  He is the proper Defendant in this case seeking only declaratory and injunctive relief only. *Patel*, 469 S.W.3d at 75-77.  As an elected official, Governor Abbott is bound by oath to uphold the Constitution of the United States and the Texas Constitution and to act subject to constitutional constraints. TEX. CONST. ART. I, § 1; Art. XVI, § 1.  Were the Court to grant the relief sought by the Plaintiff, it will certainly eliminate the injury complained of, and thus Governor Abbott is a proper party because an injunction of his enforcement would likely redress a discrete injury to Plaintiff by prohibiting his enforcement. *Cruz*, 2016 WL 1463983 at *10; *Richards v. LULAC*, 868 S.W.2d 306 (Tex. 1993).  Both are proper, not immune, parties.

Additionally, Defendants suggest that "the Eleventh Amendment protects states from suit in federal court regardless of the remedy sought." Mot. p. 14.  That may be true, but Plaintiff sued Defendants in a Texas state court.  Apparently concerned about the justice they might receive in the Texas state court system, the Governor and the Attorney General's Office removed the dispute

to this Honorable Federal Court.  Then, they have turned around and are now arguing to this Court that the State and its elected official are immune from being sued in federal court (the forum they consciously and deliberately chose).  Even Defendants in the next page (15) appear to acknowledge the obvious waiver: "Although Defendants may have waived their immunity *from suit* by removing this case to federal court, that removal does not waive Defendants' immunity *from liability*, which they would enjoy if the suit had remained in state court." Mot. p. 15.  Of course, Plaintiff is not seeking money damages from Defendants.

However, if Defendants' Eleventh Amended argument is an effort to remand to state court, Plaintiff does not oppose it.  If this is simply acknowledging that they have waived their immunity from suit argument that they seemed to have raised the page before, Plaintiff accepts it.  If this is saying that the Defendants should be treated just as if they were in state court, Plaintiff is fine with that since there are express waivers of sovereign immunity from "liability" for the type of relief sought here (declaratory and injunctive) under settled Texas law and the state's self-created common law sovereign immunity does not bar suits challenging state action (including enactment of laws) as violating the Constitution. See *Patel*, 469 S.W.3d at 75-76).

Finally, Defendants again misstate Plaintiff's claims by saying that Plaintiff complains "that the Governor reached an incorrect decision while exercising his constitutional authority" Mot. p. 16.  Instead, Plaintiff says that Section 423.002(a)(14) violates equal protection on its face, this action was unconstitutional, and should be declared as such and enjoined from enforcement.

Specifically, what Plaintiff has plead is that:

> By signing the bill into law, Abbott has acted without legal authority, as that term is understood, in connection with the issues in this lawsuit, and thus Flores sues him in his official capacity not necessarily "to alter government policy but rather to enforce existing policy", namely providing Flores and others the constitutional right

to privacy and equal protection. *See e.g. City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

Flores is entitled to declaratory relief and an injunction against Governor Abbott because in his actions towards Flores and all others who live within 25 miles of the U.S.-Mexico border, Section 423.002(a)(14) of the Texas Government Code violates the Constitution of the United States and the Texas Constitution.

Pleading more specifically, this statute is contrary to the Fourteenth Amendment's Equal Protection Clause, the Supremacy Clause, and the constitutional Right to Privacy protected by the United States Constitution against arbitrary acts by the government.

*See* Petition (D.E. No. 1) ¶¶ 23-26.

### D.   Plaintiff has plead a viable Equal Protection Challenge.

Plaintiff's pleading and equal protection challenge is very clear: Section 423.002(a)(14) violates equal protection on its face because it treats border residents (the vast majority of which are of Mexican origin) differently than residents outside the artificially-created "25 mile" strip.

As another Texas district court in a recent challenge involving Governor Abbott has succinctly written:

> The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The basis of an equal protection claim therefore is the requirement that all persons similarly situated should be treated alike.

*Cruz*, 2016 WL 1463983 at *18.

The constitutional protections in the Fourteenth Amendment are "*universal in their application, to all persons within the territorial jurisdiction*, without regard to any differences of race, of color, or of nationality." *Plyler v. Doe*, 457 U.S. 202, 212 (1982) (emphasis in original). The Fourteenth Amendment "reaches into every corner of a State's territory." *Plyler*, 457 U.S. at 215. ***That includes all of the territories in the counties impacted by this 25-mile invisible***

16

*fence/wall*.  The Fourteenth Amendment also reaches "every exercise of state authority." *Plyler*, 457 U.S. at 212.

Plaintiff asks the Court to take judicial notice of the predominantly Mexican/Hispanic composition of the border counties and cities which include: Webb County/Laredo, Maverick County, El Paso, and Hidalgo County.[15]  Laredo has approximately a quarter of a million residents including Flores who reside within 25 miles of the border.  Considering 650,000 people live in the El Paso area, many in Eagle Pass and Del Rio, and many more in the Valley and other border towns, perhaps a million Texans are being treated categorically different from those living in the rest of the State.

Without any expressed reason provided--much less a compelling or rational one--it is difficult to understand why so many American citizens and residents, property owners, and others would be treated so radically different from other Texans.  Contrary to the suggestion by Defendants on page 12 of their Motion that Plaintiff is trying to "establish his standing by identifying injuries allegedly suffered by third parties", instead Plaintiff is establishing that he is a member of a protected group that could trigger strict scrutiny in an equal protection challenge. *Hernandez*, 347 U.S. at 478-79; *Castaneda*, 430 U.S at 495.  The law is clear that people with Mexican ancestry who are targeted may seek strict scrutiny. *Id*.

---

[15] *See e.g.,* U.S. Census Bureau, Quick Facts: Webb County, Maverick County, El Paso County, and Hidalgo County, Texas,  http://www.census.gov/quickfacts/table/PST045215/48109,00 (last visited August 12, 2016) and Nazrul Hoque, Clyde McNeil, & Jim Granato, *Projections of the Population of Texas and Counties in Texas by Age, Sex, and Race/Ethnicity form 2010 to 2050*, August 18, 2016, http://www.uh.edu/class/hcpp/_docs/research/population/2014%20PPRLE-SV2.pdf (attached as Exhibit 6); *see also* https://en.wikipedia.org/wiki/Laredo,_Texas  (95% of 236,000);
https://en.wikipedia.org/wiki/Brownsville,_Texas  (93% of 183,000);
 https://en.wikipedia.org/wiki/El_Paso,_Texas (81% of 650,000);
https://en.wikipedia.org/wiki/Maverick_County,_Texas  (95% of 54,000);
https://en.wikipedia.org/wiki/Hidalgo_County,_Texas        (91% of 775,000).

The State cannot legitimately question whether strict scrutiny is proper in constitutional challenges of statutes that discriminate against persons of Mexican ancestry given the historical context.  Even in the 20th Century, persons of Mexican national origin were expressly denied the use of bathrooms in Texas courthouses in South Texas that were reserved for Anglos and segregated "Mexican school" existed. *Hernandez v. Texas*, 347 U.S. 475, 476-480 (1954). According to the United States Supreme Court:

> [t]he participation of persons of Mexican descent in business and community groups was shown to be slight.  Until very recent times, children of Mexican descent were required to attend a segregated school for the first four grades.  At least one restaurant in town prominently displayed a sign announcing "No Mexicans Served." ***On the courthouse grounds at the time of the hearing, there were two men's toilets, one unmarked, and the other marked "Colored Men" and "Hombres Aqui" ("Men Here").***  No substantial evidence was offered to rebut the logical inference to be drawn from these facts, and it must be concluded that petitioner succeeded in his proof.

*Hernandez*, 347 U.S. at 479-480 (emphasis added); *see also ISD v. Salvatierra*, 33 S.W. 791, 792-94 (Tex. Civ. App.—San Antonio 1930, no writ) (describing "Mexican school" in Del Rio segregated from Anglo school justified on grounds of being children of migrants).

In the case of Latinos/Hispanics, there are often proxies for discrimination like language, accent, or other traits. *See e.g., Hernandez v. New York*, 500 U.S. 352, 355 (1991) (prosecutor argued that he wasn't intending to strike Hispanics, only "people who speak Spanish").  As was once artfully written in connection with a Supreme Court cert petition:

> "One thing is not vague or uncertain, however, and that is that those who discriminate against members of this and other minority groups have little difficulty in isolating the objects of their discrimination. And it is precisely this discrimination, as alleged by appellants in their complaint, that presents the 'questions of law or fact common to the class.'"

*Tijerina v. Henry*, 398 U.S. 922 (1970) (Douglas, J., dissenting).

Geography can sometimes serve as this type of proxy for discrimination against persons of Mexican ancestry. *Richards v. LULAC*, 868 S.W.2d 306, 312 n. 6 (Tex. 1993), citing *Hernandez*, 347 U.S. at 478-79 and *Castaneda*, 430 U.S at 495.

The Court may take judicial notice, and Plaintiff has also provided some documents created under the auspices of the State of Texas and the Federal Government, showing that border counties are overwhelmingly (in the 90% range) comprised of individuals who are of Mexican-American national origin--like Flores.[16]  A law targeting the people in these geographic areas for radically different treatment without any justification violates equal protection because it treats people of Mexican descent and national origin as well as others who live or have property as far away as 25 miles from the border as being less important than those of other Texans or less worthy of protection from drone-taken images.

Additionally, and as discussed below, the Right to Privacy has been considered a "fundamental right", the potential infringement of which may trigger "strict scrutiny."  For the reasons stated in this Response, the law fails both strict scrutiny and rational review scrutiny.

Defendants suggest that if rational review is the standard, that Plaintiff must "negate '*every conceivable basis* which might support' the challenged position." Mot. p. 16.  While this may be an argument to make at summary judgment, that should not be the basis in a Rule 12 proceeding. Regardless, in all candor, Plaintiff cannot conceive and Defendants have failed to offer of ***any*** basis which might support the challenged position not based on a discriminatory, irrational *animus*.

---

[16] According to a publication by the State of Texas: The Texas border currently has a population of 2.7 million residents, considered to be one of the busiest international boundaries in the world, and negatively defined by health disparities and social determinants of health.  The study notes that most border residents are Hispanic (87.8%).  See http://www.dshs.texas.gov/borderhealth/; attached as Exhibit 3.

**E.    Defendants' Preemption and Privacy Arguments are Misguided.**

Defendants' Motion takes issue with language in Plaintiff's Petition about immigration being preempted by federal law rather than state law. *See* Motion pp. 21-26, Petition ¶ 14.  Plaintiff raised that issue not as an affirmative claim seeking relief on some grounds of preemption, but rather anticipating that Defendants may try to justify Section 423.002(a)(14) on some type of quasi-immigration/Arizona SB 1070 ("show me your papers")-type reasoning. *See Arizona v. United States*, 132 S.Ct. 2492, 2505 (2012).  Specifically, this is what Plaintiff plead:

> Defendants Texas and Abbott cannot justify Section 423.002(a)(14) of the Texas Government Code based on some State "immigration policy" because the law is clear that the Federal Government is preeminent in the area of immigration and that basis would be contrary to the Supremacy Clause of the United States Constitution. *Arizona v. United States*, 132 S. Ct. 2492 (2012).  States cannot act unilaterally in a manner that is contrary to the policies of the Federal Government which include, of course, the United States Constitution.

Petition ¶ 14.

Apart from being black letter law, Plaintiff would offer that if Defendants stipulate that they will not argue about immigration policy as a basis to justify the disparate treatment of Plaintiff and other border residents, then Plaintiff will accept that stipulation and moot that issue.  If, on the other hand, Defendants try to cloak themselves in some sense of trying to protect the public from some immigration-related argument about the border, then preemption issues will be implicated in this case and case law would preclude the State from relying on those types of constitutionally impermissible rationales. *Arizona* 132 S.Ct. at 2505; *Cruz*, 2016 WL 1463983 at *10 (even in the absence of an express private right of action in a statute, a plaintiff nevertheless has a right of action in equity to bring a claim under the Supremacy Clause).

Also not applicable is the "Border Exception"[17]--or as some have called it "the Mexican Exception"[18]--to the Fourth Amendment.  The Border Exception applies to allow warrantless searches, particularly of vehicles at checkpoints, which might otherwise be considered in other parts of the United States to violate the Fourth Amendment's protections against warrantless searches and unreasonable searches and seizures by the Government.  However, there is no correlation between the areas and types of searches covered under the Border Exception and the artificial pre-1848ish "25 mile from the U.S. border" or the invisible fence/wall concocted in Section 423.002(a)(14).

Finally, Defendants appear to concede—as they should—that the Constitution does recognize a right to privacy. Mot pp. 17-18; s*ee Griswold v. Connecticut*, 381 U.S. 479, 482-86 85 S.Ct. 1678 (1965).  They seem to pick at the notion that the right of privacy does not extend to being protected from unwanted or unsolicited unlimited use of data or imagery.  The key point ***in this case*** is that whatever the exact contour of the right of privacy from the capture of imagery or data that one owns by UAS is, in this context, it should not be different for a person who resides in Laredo or El Paso than it is for a person who resides in Amarillo, Dallas, Lubbock, or Tyler.

### Request for Relief

For these reasons, Flores requests that the Court deny the Motion and when considering the merits of the facial challenge to the subsection of the statute at issue, that the Court declare that (1) Section 423.002(a)(14) of the Texas Government Code is unconstitutional and contrary to the U.S. Constitution and the Texas Constitution; (2) Defendants have violated Flores' constitutional rights; (3) Flores recover his costs; and (4) Flores recover all other just relief.

---

[17] *See e.g., U.S. v. Montoya de Hernandez*, 473 U.S. 531, 537-44 105 S.Ct. 3304 (1985).

[18] *See* Alfredo Mirande, *Is there a "Mexican Exception" to the Fourth Amendment?*, 55 Fla. L. Rev. 365 (Jan. 2003).

Respectfully submitted,

MCGINNIS, LOCHRIDGE & KILGORE, L.L.P.


By:  s/Carlos R. Soltero_____
      Carlos R. Soltero
      State Bar No. 0791702
600 Congress Avenue, Suite 2100
Austin, Texas 78701
Phone: (512) 495-6033
Fax: (512) 495-6093
csoltero@mcginnislaw.com

**ATTORNEYS FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

      I hereby certify that on August 18, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:


Ken Paxton, Attorney General of Texas
Jeffrey C. Mateer, First Assistant Attorney General
Brantley Starr, Deputy First Assistant Attorney General
James E. Davis, Deputy Attorney General for Civil Litigation
Angela V. Colmenero, Division Chief, General Litigation Division
Adam N. Bitter, Attorney-in-Charge
Assistant Attorney General
Office of the Attorney General
General Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
Tel: (512) 475-4651
Fax: (512) 320-0667
adam.bitter@texasattorneygeneral.gov

ATTORNEYS FOR DEFENDANTS


      /Carlos R. Soltero_____
        Carlos R. Soltero